## Bullock Estate

390

*Caldwell, Fox & Stoner* and *Maurice Yoffee*, for accountant.

*David M. Wallace*, for exceptant.

RICHARDS, P. J., September 17, 1951.—Sue E. Zeigler Bullock died testate on April 4, 1950. She was survived by Harold Eldridge Zeigler, a son by her first marriage, and by her second husband, Joseph Bullock. Her will gave nothing to her husband but named her son as executor and sole beneficiary. Letters testamentary were issued to the son. He filed his first and final account on October 23, 1950. The surviving husband, under date of December 19, 1950, filed an election to take against the will of decedent. Thereafter, he filed exceptions and supplemental exceptions to the account, and testimony was taken thereon. . . .

This brings us to the last exception numbered 8(a). This relates to the ownership of certain securities and to the liability of the executor to account for them.

On December 18, 1944, Mrs. Bullock went to the First Federal Savings and Loan Association of Harrisburg for the purpose of investing $6,000. She talked to Miles Armstrong, secretary and executive vice president of the company. He testified that she wanted "the son to get this money in case something happened to her". This phrase is obviously not an exact quotation of her words. He explained that the maximum Federal insurance coverage could be obtained by investing $5,000 in one account and the other $1,000 in another account. This was done in the manner we shall hereinafter describe. On July 14,

1947, Mrs. Bullock invested an additional $1,000. All of the money invested, totaling $7,000, was Mrs. Bullock's own money. Since the two $1,000 investments are of the same type, we shall first direct our attention to them.

On December 18, 1944, Mrs. Bullock signed an application for an investment share account designating herself as "trustee for her son H. Eldridge Zeigler, beneficiary, as specified in trust agreement on reverse side hereof". The reverse side is captioned "Trust Agreement". The body of the trust agreement reads as follows:

"I/We, the undersigned Grantor do hereby give and grant the Savings (Investment) Share Account applied for on the reverse side hereof, together with all payments and dividends thereon, to the Trustee named on the reverse side hereof; to have and to hold the same in trust, for the beneficiary named on the reverse side hereof, for the following uses and purposes, to-wit:

"To repurchase and transfer the same in whole or in part, and to exercise full control over the participation value thereof as though the account were held absolutely free and discharged of any trust, and without obligation on the part of the Association to look to the application of the fund.

"In the event of the death of the Trustee, the Association shall, if the beneficiary has attained the age of —— years, transfer or pay the repurchase value of the account to the beneficiary, free and discharged of any trust; and if at the death of the Trustee named the beneficiary has not attained such age, the Association is authorized to name and appoint a suitable person or persons as successor Trustees to hold the account until the beneficiary has attained such age, at which time such successor Trustee shall transfer and assign to the beneficiary the account, free and

discharged of any trust. Such successor Trustees shall have the same powers and control over the account as the Trustee herein named.

"Dated this.....day of.............19....."

The trust agreement is not dated or signed. Pursuant to the application a $1,000 certificate was issued to "Sue E. Bullock, Trustee for H. Eldridge Zeigler."

On July 14, 1947, a second $1,000 certificate was issued in precisely the same form. The record contains no evidence of any statements made by Mrs. Bullock at the time of this purchase. Apparently no new application was made, for Mr. Armstrong testified that the application of December 18, 1944, applied to both of the trustees certificates, although they were issued in 1944 and 1947, respectively.

Opposing counsel have made no point of the fact that Mrs. Bullock did not sign the trust agreement when the first $1,000 certificate was bought. Neither have they questioned the issuance of the second certificate without a new application and without the signing of the trust agreement at that time. Rather, they have presented the case to us as one involving her intent as evidenced by her remarks, and the legal effect of the application and the trust agreement. In other words, it has in effect been conceded that we shall base our conclusions upon the assumption that the application and the trust agreement were duly executed at the time the two certificates were acquired. We think this is clearly a tenable position as to the first certificates since the application there states that Mrs. Bullock was "trustee for H. Eldridge Zeigler, beneficiary as specified in trust agreement on reverse side hereof". Since the second certificate was bought with the same understanding, as a follow up of the first, it may well be concluded that the same factors apply. Since this reflects the contention of the respective parties, we shall proceed upon that basis.

The question therefore is, did any present interest pass to the son on the dates the two certificates were issued?

We have read and considered many cases cited by counsel as controlling. We shall be content to mention but two.

Mr. Justice Allen M. Stearne, in the recent case of McKean Estate, 366 Pa. 192, 195, stated:

"Prior to the Estates Act of 1947, this court repeatedly decided that where a settlor, by his deed vests a *present* interest in the beneficiaries but reserves a beneficial interest and also a power to revoke or modify the deed in whole or part, such interests are not thereby constituted mere *expectancies* but are *present vested* interests. . . ." (Italics supplied.)

We may interpolate that no issue has been raised before us relating to the Estates Act of 1947. However, the opinion quoted clearly indicates that the act does not apply retrospectively. Hence, it could not apply in the present case, since all the securities involved were purchased before the effective date of the act.

The case which we think is very much in point is Tunnell's Estate, 325 Pa. 554. The late Mr. Justice Linn there stated (p. 559):

"While a trust *inter vivos* does not fail because a settlor declares that he holds the property in trust, with power to revoke and to receive the income during his life, it is well settled that 'where the settlor declares himself trustee and reserves not only a beneficial life estate and a power to revoke and modify the trust *but also power to deal with the property as he likes as long as he lives,* the intended trust is testamentary'." (Italics supplied.)

Mr. Justice Linn also called attention to the fact that there is an exception to this rule as to tentative

trusts of bank accounts. But we are not dealing here with a bank account.

There is no dispute that Mrs. Bullock collected and kept the income from these trust certificates during her lifetime. She also retained the certificates in her possession. The son obtained possession of them and transferred them as executor.

The trust agreement empowered her:

"To repurchase and transfer the same in whole or in part, and to exercise full control over the participation value thereof as though the account were held absolutely free and discharged of any trust, and without obligation on the part of the Association to look to the application of the fund."

To repurchase means to withdraw the account. Transfer means to dispose of the same by sale or assignment. Participation value includes interest. The trustee could do all of these things "as though the account were held absolutely free and discharged of any trust". This we think is more than the reservation of a beneficial interest. It is more than a power to revoke. As Mr. Justice Linn said, it was power to deal with the property as she liked as long as she lived. It was, therefore, in our opinion, a testamentary trust.

Since she did not dispose of these assets in her lifetime and did not change the testamentary disposition of her will or otherwise, these assets must be treated as part of her estate at the time of her death. As such, they must be included in determining the distributive share of the surviving spouse.

We think that Tunnell's Est., supra, is authority for this conclusion, for there (page 560), where the terms of a testamentary trust were revoked by will, it was held that "the bonds became part of his estate to be distributed. . . ."

This brings us to the final point of the case, namely the $5,000 investment made in 1944. It will be remem-

bered that Mr. Armstrong testified that Mrs. Bullock wanted "the son to get this money in case something happened to her". On the date of purchase, December 18, 1944, the son was not at home but was in the Army. Mrs. Bullock applied for an investment share account in the "First Federal Savings and Loan Association of Harrisburg and for the issuance of evidence of membership in the approved form in the joint names of the undersigned, as joint tenants with the right of survivorship and not as tenants in common. Receipt is hereby acknowledged of a copy of the charter and by-laws of said association. Specimens of the signatures of the undersigned are shown below and the association is hereby authorized to act without further inquiry in accordance with writings bearing any such signatures; it being understood and agreed that any one of the undersigned who shall first act shall have power to act in all matters related to the membership and any share account in said association held by the undersigned, whether the other person or persons named in the certificate be living or not. The repurchase or redemption value of any such share account or other rights relating thereto may be paid or delivered in whole or in part to anyone of the undersigned, who shall first act, and such payment or delivery, or a receipt or acquittance signed by anyone of the undersigned, shall be a valid and sufficient release and discharge of said association."

Mrs. Bullock signed this application on the date mentioned and on the same date the certificate was issued to "Sue E. Bullock or H. Eldridge Zeigler". Upon his return from the Army, and long before the death of his mother, the son went to the office of the company and signed the application.

The instructions on the face of the application read as follows:

"The certificate issued pursuant to this application for membership of joint holders must be filled out by inserting in the first blank space the names of the joint holders, for example, 'John Doe and Richard Roe,' immediately followed by the words: 'as joint tenants with the right of survivorship and not as tenants in common. Signature of any one co-tenant (with the right of survivorship) is binding on the others."

Notwithstanding these clear instructions, which were not followed, the certificate was issued in the form above stated. In view of the clear and unambiguous terms of the *application*, we hold that the certificate shall have the effect which it would have had if it had been issued as directed. In other words, the certificate will be construed as issued to "Sue E. Bullock and H. Eldridge Zeigler, as joint tenants with the right of survivorship, and not as tenants in common".

In the recent case of Isherwood, Exec., v. Springs-First National Bank, 365 Pa. 225, Mr. Justice Jones discussed the creation of joint accounts, the type of evidence required to demonstrate the creation of a present vested interest therein, and who has the burden of proof. In this case the account was opened with a deposit "By Mrs. Jennie Isherwood and Ruth Dowler". The pass book bore the designation "Mrs. Jennie Isherwood or Ruth Dowler". Mrs. Isherwood retained the possession of the pass book until her death. The bank ledger sheet contained the typed phrase "Payable to either or the survivor as joint tenants and not as tenants in common". The opinion states (p. 231) :

"Applying the foregoing principles to the facts of this case, it follows that the claimant failed to produce evidence of the probative character required to sustain her burden of proving that the decedent affirmatively expressed or evidenced an intention to give her daughter at the time of the opening of the account in

the Springs-First National Bank a presently vested interest therein or that she executed any such intention by an equivalence of delivery. Indisputably, there was no actual delivery of the pass book; Mrs. Isherwood retained possession thereof throughout her lifetime: see *Crist's Estate*, supra. Nor was there either signed signature card or written agreement of the parties with respect to the ownership of that savings account: see *Mardis v. Steen* and *Mader v. Stemler*, supra. Just as in the *Flanagan* case, the memoranda on the bank's ledger sheet '. . . were made by an (employee) of the bank without evidence that the notations were made pursuant to direction given by decedent'."

Mr. Justice Jones also referred to Mader et al. v. Stemler et al., 319 Pa. 374. In this case Mr. Justice Linn discussed at some length an account in the name of a father and a daughter. We quote from his opinion as follows:

"In the Camp Curtin Trust Company there was a savings account of $5,639 which is the subject of appeal No. 9. On Dec. 7, 1926, when the credit was $861.00, the account was changed from Frank Stemler to 'Frank Stemler or Jean Stemler,' on the books of the company. Stamped on the signature card and signed by both depositors was the following: 'The sums deposited in this account belong to Frank Stemler and Jean Stemler jointly, it being understood each may withdraw upon his or her or their individual order during joint lives, and we hereby direct and authorize the Camp Curtin Trust Company, Harrisburg, Pa., to pay any balance remaining upon the death of either of us to the survivor.' All the deposits were made by the decedent. After Stemler's death, the account was withdrawn by Jean Stemler . . .

"No. 9, appeal of Jean Stemler, raises a different question; It is: What was the effect of the agreement

prepared by the bank and signed by both parties on Dec. 7, 1926, in the circumstances shown? It may again be repeated: 'The sums deposited in this account belong to Frank Stemler and Jean Stemler jointly, it being understood each may withdraw upon his or her or their individual order during joint lives, and we hereby direct and authorize the Camp Curtin Trust Company, Harrisburg, Pa., to pay any balance remaining upon the death of either of us, to the survivor.' Certain results were undoubted. The bank agreed to repay the deposit to either on demand. Its obligation was a chose in action. As between him and his daughter, Stemler transferred to her an interest in the chose —an interest in the right to receive payment from the bank; he expressed his donative purpose; as part of the evidence of intention, he executed and delivered the agreement creating a joint interest with the right of survivorship. They agreed that 'the sums deposited . . . belong to . . . (them) . . . jointly'; they provided that either might withdraw the money during their joint lives, and the survivor, on the death of either. An interest as joint owner was transferred, as appears from the statement that 'the sums . . . belong to . . . (them) . . . jointly'; it was not merely a power to collect (as to which, see *Flanagan v. Nash*, supra; *Zellner's Est.*, supra). When, therefore, after Stemler's death, the bank paid the money to Jean Stemler, it discharged its obligation by paying to the survivor in accordance with the contract made by the bank and the depositors. On the main question, the learned Chancellor thought the case was similar in fact to *Flanagan v. Nash*, supra, and *Grady v. Sheehan*, 256 Pa. 377, 100 A 950, in which it was held that the evidence was insufficient to establish title to the fund as a gift *inter vivos*. In neither of those cases was there, as in Appeal No. 9, a writing signed by the parties, completely expressing the intention to vest by

assignment a present joint interest in the chose in action with the right of survivorship. This distinction was noted in *Mardis v. Steen*, supra; *Crist's Est.*, supra, 580 . . ."

These two cases seem to make clear what is and what is not sufficient to create a joint estate. The facts of the case at bar are very similar to the facts in Mader v. Stemler, supra. There was a signature card bearing the signatures of both parties. The application which was signed unequivocally states the intention to create a joint tenancy with the right of survivorship and not a tenancy in common. Each of the parties is authorized to act in all matters related to the account whether the other be living or not.

"The repurchase or redemption value of any such share account or other rights relating thereto may be paid or delivered in whole or in part to any one of the undersigned who shall first act, and such payment or delivery or a receipt or acquittance signed by any one of the undersigned shall be valid and sufficient release and discharge of said association."

It is difficult to see what more could be done to accomplish the common purpose of the mother and son to create a joint tenancy with the right of survivorship and to vest present interests in each of the parties. Surely the mother had the right to use her own money for this purpose if she chose to do so. It is true that the mother retained possession of the certificates but she did not retain possession of the application. That remained with the association. We feel that the joint execution of the application was, as stated by Mr. Justice Jones in the Isherwood case, supra, an evidence of the mother's intention executed by *an equivalence of delivery*. Mr. Justice Linn, in the above excerpt, said: "An interest as joint owner was transferred . . ." The issue does not depend, in our opinion, upon the mere possession of the certificates. The mother would

not have lost her rights by permitting the son to have possession of it. Neither did the son lose his rights because the mother retained it. Only one could have the certificate unless they arranged it some way for joint possession or access.

It is our considered opinion that a joint tenancy with right of survivorship was created and has been adequately proven, and that the application vested present rights in each joint tenant. It follows that the $5,000 investment represented by the certificate in question is not an asset of the estate of decedent for which her executor must account.